## Hallowell *et al. versus* Horter.

35   375
140   574

A merchant failed in business and became insolvent; after his failure and insolvency, his wife commenced business in her own name, purchasing goods at first on the endorsements and guarantees of her husband's father, and continuing the business for some years with capital loaned to her by the same party, the husband transacting all the business in his wife's name: *Held*, that the stock of goods so held in the wife's name was liable to execution at the suit of the husband's creditors.

A loan made to the wife under such circumstances became the debt of the husband, and he was the owner of the goods thus purchased; as also of the proceeds of the joint skill and labour of himself and wife.

ERROR to the District Court of *Philadelphia*.

This was a feigned issue under the Sheriff's Interpleader Act of the 10th April 1848, wherein Mary Jane Horter was plaintiff, and M. L. Hallowell & Co. defendants, to determine whether a stock of dry goods levied on by the sheriff, under an execution against Washington Horter, the plaintiff's husband, and claimed by her, were the property of the said Mary Jane Horter.

In 1854, Washington Horter failed in business, and became utterly insolvent, being indebted, among numerous other creditors, to M. L. Hallowell & Co., the defendants, in the sum of $851.09, for which they obtained judgment against him on the 1st September 1856.

In 1855, Mary Jane Horter, the plaintiff, commenced business, at Eleventh and Locust streets, in the city of Philadelphia; she purchased goods at first on the endorsements and guarantees of George Horter, her husband's father; and in 1856, he loaned to her $1000, with which she carried on the business from that time forward. During the whole time, Washington Horter, her husband, was with her in the store, assisting in and carrying on the business; he purchased the goods, and paid for them, either with money, or with his wife's notes or checks.

On the 3d November 1858, an execution at the suit of M. L. Hallowell & Co. against Washington Horter was levied upon the stock of goods at Eleventh and Locust streets, and the plaintiff having claimed the same as her separate property, this issue was framed to determine her right to the goods levied on.

On the trial, the defendants' counsel presented the following points in writing, upon which the court below was requested to charge the jury:—

1. The plaintiff claims to be the owner of the property in question in this issue, by purchase during her coverture, and after the insolvency of her husband. Under such circumstances, she must show, by evidence which does not admit of a reasonable doubt, that she bought it with her own money, and paid for it with funds

[Hallowell *et al. v.* Horter.]

which were not furnished by her husband. No such evidence has been given in this case. The plaintiff, therefore, is not entitled to recover, and the verdict should be for the defendants.

2. If the jury believe that the business was carried on by the plaintiff, under an arrangement with her husband, that he purchase goods on her credit, and· manage the business as her agent, and pay for the goods out of the proceeds of the sales thereof, then the business is her husband's business, and the goods are liable for his debts, and your verdict should be for the defendants.

3. If the jury believe that the business was commenced by the plaintiff on borrowed money for capital, and that her husband was with her carrying on said business, he buying the goods for her on her credit, and paying for them out of the profits of the business so carried on, then the plaintiff is not entitled to recover, and your verdict should be for the defendants.

The court below refused to charge as requested in the first and third points. And in answer to the second point, said that the question would depend on whether the business was carried on with money advanced solely on the credit of the wife, and for her· benefit, or whether it was carried on with the funds of the husband, and for his benefit. That if the transaction was in other respects fair, the funds loaned on the credit of the wife, and the business her business—the fact that the husband acted as her agent, or gave his aid in managing it, and that new purchases were made, from time to time, out of the proceeds of sales, while the business was so conducted, would not render the transaction fraudulent; nor make it the duty of the jury to find for the defendants.

To this instruction the defendants excepted; and a verdict having been rendered in favour of the plaintiff, they removed the cause to this court, and here assigned the same for error. On a motion for a new trial in the court below, the following opinion was delivered by HARE, J. :—

"The questions of fact, and among them that of *bona fides*, in this cause, have been disposed of by the verdict of the jury; what remains is a question of law of some difficulty, and no less importance. That a married woman, who has separate property, may embark in trade or business, without rendering the funds which she employs, or the goods in which they may be invested, liable to the debts of her husband, is well settled. Does a married woman, who having no property of her own, but who having skill, borrows the capital necessary to render that skill available, stand in so unfavourable a position, that what is loaned on her credit becomes, *ipso facto*, the property of her husband, and liable for his debts? It will not be said, that a gift to a feme covert, from a friend or relative, for the purpose of setting her up in business, is the less hers, or more subject to her husband's creditors, than if

[Hallowell *et al. v.* Horter.]

it were a purchase, and not a gratuity; and it may be asked, in what a loan for the benefit of a borrower, who can make no binding promise to repay, and whose sole obligation is merely honorary, differs, so far as third persons are concerned, from a gift. In both cases, the owner parts with his money; in both, his object is to benefit the recipient; in neither, can he enforce repayment or restitution. It has, however, been said, that a loan to a married woman, with the knowledge of her husband, and for a purpose which he approves, charges him with the obligation which it cannot impose upon her, and renders the debt as much his as if he had contracted it. I agree to this, if the loan be made in the course of a business conducted for or by the husband, although in the name of the wife, or if it be on his credit, although in her business. But if the loan be made to her, and for her purposes, and not directly or indirectly to him or on his responsibility, it will, as I conceive, make no matter that he knew and approved of that which, if fair and honest, ought not to have been forbidden. That there may be such a thing as a loan to a wife during marriage, constituting a consideration, and affording a good ground for a promise, as soon as the death of the husband has put an end to the disability of coverture, is shown by the case of Hemphill *v.* McClimans, 12 *Harris* 367; which shows that money lent under such circumstances becomes the property of the woman, because she would otherwise be under no obligation to repay it, either during the life of her husband or after his death, and consequently, could not be bound even by an express promise. · It is true, that the feme covert, by whom the promise of repayment was made, in Hemphill *v.* McClimans, had a separate estate, but the loan was not made upon the credit of her property, and was in no respect binding or chargeable upon it. I therefore incline strongly to the opinion, that a loan or sale to a married woman, solely on her credit, partakes so far of the nature of a gift, as to invest her with a right, without any corresponding legal obligation, which is exclusively hers, and consequently, cannot be seized by her husband's creditors in contravention of the purpose of the vendor or lender; and that the law will not preclude married women from gaining that support by their own skill and labour, which they sometimes can obtain in no other way, nor aggravate the ill consequences of the faults or misfortunes of a husband and father to his wife and children, by denying them any alleviation which may result from the kindness of others, or from their own honest exertions. Rule discharged."

*S. T. Van Sant,* for the plaintiffs in error.—That the defendants were entitled to have their first point answered in the affirmative, can admit of no doubt; the point is well settled by authority: Gamber *v.* Gamber, 6 *Harris* .363; Keeney *v.* Good,

9 *Id.* 349; Hoar *v.* Axe, 10 *Id.* 384; Bradford's Appeal, 5 *Casey* 515; Topley *v.* Topley, 7 *Id.* 328; and the evidence fully warranted it.   It is equally well settled, that a husband is entitled to all moneys earned by the skill and labour of his wife : Raybold *v.* Raybold, 8 *Harris* 308; and a wife, who is not a *feme sole* trader, cannot carry on business, through her husband, acting as her agent, on borrowed capital, so as to bring her earnings within the protection of the Act of 1848.   Heugh *v.* Jones, 8 *Casey* 432; Petit *v.* Fretz's Executor, 9 *Id.* 118; Bear *v.* Bear, *Id.* 525; Jacobs *v.* Featherstone, 6 *W. & S.*, 346.

*Heyer*, for the defendant in error, cited the opinion delivered by HARE, J., in the court below.

The opinion of the court was delivered by

WOODWARD, J.—A merchant breaks down one year deeply indebted—the next year he is in full blast again, buying and selling goods in his wife's name, which were purchased under endorsements and guarantees by his father—the next year his father loans his wife $1000, which probably went into the business—though that was not proved—and the next year a judgment-creditor of the husband levies the goods then on hand in execution of his judgment—does the fact that $1000 was loaned to the wife vest in her such a separate property in the goods as enables her to hold them against the execution-creditor of her husband ? We think it does not.

The learned judge argued that as the loan could not be recovered of the wife, it was a gift, and so became her separate property.   This was the ground on which Manderbach *v.* Mock, 5 *Casey* 46, was ruled; but his reliance on the case of Hemphill *v.* McClimans, 12 *Harris* 367, would seem to indicate, that the learned judge was not quite satisfied with the theory that this was a gift to the wife, but that he was inclined rather to regard it as a debt, for which she would be liable after discoverture.   It is difficult for us to see the applicability of that case, except in this view.   A married woman, with a considerable separate income of her own, induced a man to build a saw-mill for her son, promising that she would pay for the work.   After her marriage was dissolved by a divorce, she renewed the promise again, and a majority of this court held, that the moral obligation to pay for the labour she had induced the plaintiff to expend for her son, was a sufficient consideration to support her express promise after she was discovert.   That became the debt of a *feme sole*—the note given for the borrowed money in this case, if the debt of a woman, is the debt of a married woman, and so there is no analogy betwixt the cases.   And if Mrs. Horter should be sued on that note, it would be sufficient for her to plead her coverture,

and that the note was not given for necessaries : Imhoff *v.* Brown, 6 *Casey* 506.

But could not the note be recovered of the husband? It was his legal duty to support his family, and when a husband permits and encourages his wife to borrow money for the purposes of trade which he carries on in her name, and in this manner makes a living for himself and family, we have no doubt that he is liable, and solely liable, for the money borrowed. The wife is to be regarded as his agent in making the loan, and his ratification of her act, if precedent authority be not proved, may be inferred from his use and enjoyment of the money. That the Act of 1848 does not enable her to contract debts in her own name as a *feme sole*, may be seen from the expositions of that statute in Pettit *v.* Fretz, 9 *Casey* 120, and Bear's Adm'r. *v.* Bear, *Id.* 527.

If the loan cannot be regarded as the debt of the wife, so neither can it be considered a gift to her. There was no evidence that a gift was intended. On the contrary, George Horter, the father, swore that he loaned the money to his daughter-in-law instead of his son, because he thought it would be safer. If we were to go on presumptions, from the relation of the parties and all the circumstances in evidence, we should be quite as likely to conclude, that the gift, if indeed a gift were intended, was to the son as to the daughter-in-law, and that the note was taken in her name the better to elude the son's creditors. But, as the case is presented to us, the presumption we are bound to make is, that the father intended his money to be a loan and not a gift, and, therefore, that he would avail himself of all his legal remedies to recover it back. When he should discover that his only legal remedy was against his son, he would realize the true nature of the transaction; or rather, he would learn, then, that the law treats the transaction according to its true nature, instead of being deceived by the form it was made to assume.

But, independently of this view of the loan, we do not understand that the goods seized in execution were purchased with that money. Washington Horter and his wife began to trade in her name early in the year 1855. The notes and bills guarantied by George Horter, the father, during that year, were all paid, and paid doubtless, out of the profits of the business. In March 1856, he loaned the $1000 which it is assumed went into the business. In November 1858, Hallowell & Co. levied their execution. The goods levied on (whether the whole stock or not we are uninformed) amounted to $1260.66. We infer, from the character of the goods, that the stock must have been frequently renewed. Whatever there was in the store in November 1858, represented not only this loan, but the profits of more than three years' trading, and these profits were the earnings not alone of this money, but of the skill and industry of both Horter and his wife.

[Hallowell *et al. v.* Horter.]

We thought it a little singular that it became necessary for us to say in Raybold *v.* Raybold, 8 *Harris* 311, that the husband was entitled, in his own right, to the earnings of his wife during coverture, but it is more singular still, that we are required now to decide that joint earnings of husband and wife belong to the husband and not to the wife.

Whatever may be said about the ownership of the goods purchased with the $1000, there can be no question that those which were purchased with the joint earnings of Horter and wife belonged exclusively to him, and were liable for his debts. And if these were so mixed and confused with the rest of the stock, as not to be discriminable—especially when account should be taken of all that went to the support of the family—it would seem very plain, that the wife would be in no condition to resist the husband's creditors, even if she were originally the owner of the $1000.

Under the Act of 15th April 1851, a married woman may loan her money to her husband, and secure herself by a judgment or mortgage taken in the name of a friend for her use; and this is the honest and fair way of helping him to carry on business. But after he has traded on borrowed capital until he breaks, to put her forward to trade on borrowed capital for his benefit, is a sure way to imperil, if not to destroy the credit of both. Such arrangements cannot withstand the scrutiny of the husband's creditors.

We are of opinion that the defendants' points ought to have been affirmed.

The judgment is reversed.